ILYA A. KOSTEN (SBN 173663)
ikosten@selmanlaw.com
MATTHEW C. ELSTEIN (SBN 174400)
melstein@selmanlaw.com
LORRIE A. WALKER (SBN 272637)
lwalker@selmanlaw.com
SELMAN BREITMAN LLP
11766 Wilshire Blvd., Sixth Floor
Los Angeles, CA 90025-6538
Telephone: 310.445.0800
Facsimile: 310.473.2525

Attorneys for Plaintiffs EDWARD ROTSTEIN, an individual; and TERRAFUSION INTERNATIONAL, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

EDWARD ROTSTEIN, an individual; and TERRAFUSION INTERNATIONAL, INC.,

Plaintiffs,

v.

TERRAFUSION, INC.; and DOES 1-10, inclusive,

Defendants.

Case No. 3:15-CV-02993-RS

**DECLARATION OF EDWARD ROTSTEIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST TERRAFUSION, INC. and MCCP, INC. aka MCCP, LTD. and aka MCC PARTNERS NY, LTD., INCLUDING DISMISSAL OF COUNTERCLAIMS**

**FILED CONCURRENTLY WITH MOTION FOR ENTRY OF DEFAULT JUDGMENT, ETC., DECLARATION OF ILYA A. KOSTEN, [PROPOSED] ORDER THEREON AND JUDGMENT**

FRCP Rules 55(b) and 41(b)

Judge:  Hon. Richard Seeborg
Dept.:  3

Selman Breitman LLP
ATTORNEYS AT LAW

1

Selman Breitman LLP
ATTORNEYS AT LAW

## DECLARATION OF EDWARD ROTSTEIN

I, Edward Rotstein, hereby state and declare as follows:

1.      I am a plaintiff and counter-defendant in this action, as well as the principal of Terrafusion International, Inc., also a plaintiff/counter-defendant in this action. I make this declaration based on my personal knowledge and could and would testify thereto if called upon to do so. This declaration is submitted in support of plaintiffs' Motion for Default Judgment against Terrafusion, Inc. and MCCP, Inc., aka MCCP, LTD. and aka MCC Partners NY, LTD.

2.      Beginning in 2009, one of my companies was a worldwide distributor for Terrafusion, Inc.'s soil stabilization product called EcoRoads used in road construction.

3.      My positive experience with EcoRoads led me to negotiate the purchase of certain assets from Terrafusion, Inc., including its intellectual property. As part of the negotiations, on January 18, 2011, I incorporated Terrafusion International. Inc. for the purpose of purchasing the assets and then carrying on the soil stabilization business.

4.      Plaintiff Terrafusion International, Inc. entered into the asset purchase agreement with Defendant Terrafusion, Inc. in February, 2011.

5.      After Plaintiffs paid a substantial portion of the purchase price to Defendant Terrafusion, Inc. and invested additional substantial efforts and resources to close the deal, Defendant Terrafusion, Inc. demanded material changes to the agreement, including a demand that Terrafusion International, Inc. assume certain debts and liabilities of Terrafusion, Inc. as part of the deal. When Terrafusion International, Inc. refused, Terrafusion, Inc. unilaterally cancelled the pending asset purchase deal and, instead, transferred the assets earmarked for Plaintiffs to Defendant "MCCP" without consideration.[1]

---

[1] The principal of MCCP, Inc., Mark Cukier, later claimed that all his companies are called "MCCP" for short, including MCCP, Inc., MCCP, Ltd., and MCC Partners

2

Selman Breitman LLP
ATTORNEYS AT LAW

6.     Attached hereto as **Exhibit 1** is a true and correct copy of the asset purchase agreement (with exhibits and schedules), executed by Terrafusion, Inc. and Terrafusion International, Inc., that Terrafusion, Inc. attempted to materially change and then unilaterally cancelled.

7.     Instead of being able to complete the pending deal and enjoying the benefits of the contract, Terrafusion International, Inc. and I have had to litigate against Defendants for the past five years, both before the United States Patent and Trademark Office and in this Court.  As a result of the litigation, Terrafusion International, Inc. and I have paid $325,929.13 in attorneys' fees and costs to Selman Breitman LLP to date and are advised the cost of the motion for default judgment will be an additional $12,000, for a total of $337,929.13.

8.     In addition, I have paid the Sigma Law Group $9,790.00 to date for legal services in connection with proceedings before the United States Patent and Trademark Office related to the disputes with Defendants/Counter-Claimants.

9.     Thus, the grand total of the legal expenses paid by Plaintiffs as a result of Defendants' breaches and misconduct is $347,719.13.

10.     The Defendants' meritless counter-claims in this action were filed in order to take the focus off their breach of contract and other wrongful conduct and to further interfere with and frustrate Terrafusion International, Inc.'s business.

I declare under penalty of perjury, under the laws of the United States that the foregoing is true and correct.

Executed on February 28, 2017, at Bellevue, Washington.

EDWARD ROTSTEIN, Declarant

NY, LLC.  Further, Mr. Cukier later admitted that MCCP paid nothing to acquire the assets of Terrafusion, Inc.

3

*Exhibit 1*

APR/18/2012/WED 06:42 AM   Westin Edina          FAX No. 952-567-5010              P. 001

## TERRAFUSION, INC.

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into on February 4th, 2011, by and between TerraFusion International, Inc., ("Buyer"), a Washington corporation, and Terrafusion, Inc., a Delaware corporation ("Seller"). Each of Seller and Buyer are each referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

A.      Seller currently owns certain trademarks, patent applications, patents and websites (the "IP Assets", as further defined below) and contracts set forth on Exhibit A (collectively with the IP Assets, the "Assets").

B.      Seller now desires and agrees to sell to Buyer all rights, title and interest in and to the Assets in consideration for Three Hundred Thousand Dollars ($300,000) in cash (the "Cash Consideration"), the Contingent Payments defined in Section 2.1 below, and the Equity Consideration defined Section 2.3(b) below (together with the Cash Consideration, and the Contingent Payments, the "Consideration").

## AGREEMENT

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

## SECTION 1

## Definitions

"Affiliate" means a Person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with a specified Person. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the Introduction.

"Assets" has the meaning set forth in the Recitals.

"Buyer" has the meaning set forth in the Introduction.

"Cash Consideration" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 2.2.

W\037616/000001 - 59873 v5

TFII 000001

"Closing Date" has the meaning set forth in Section 2.2.

"Confidential Information" means any information concerning the Assets and the affairs of Buyer except for information that is or becomes generally available to the public other than due to improper disclosure of any of Confidential Information by Seller.

"Consideration" has the meaning set forth in the Recitals.

"Contingent Payments" means each of the First Contingent Payment and the Second Contingent Payment.

"Derivative" means: (i) any derivative work (as defined in Section 101 of the U.S. Copyright Act) of any IP Asset; (ii) all improvements, modifications, alterations, adaptations, enhancements and new versions of any IP Asset; and (iii) all technology, inventions, products or other items that, directly or indirectly, incorporate, or are derived from, any part of the IP Assets.

"Embodiment" means all documentation, drafts, papers, designs, schematics, diagrams, models, prototypes, source and object code (in any form or format and for all hardware platforms), computer-stored data, diskettes, manuscripts and other items describing all or any part of the IP Assets or in which all or any part of the IP Assets are set forth, embodied, recorded or stored.

"Equity Consideration" has the meaning set forth in Section 2.3(b).

"First Contingent Payment" has the meaning set forth in Section 2.1.

"Governmental Authorization" means any: permit, license, export license, re-export license, certificate, franchise, concession, approval, consent, ratification, permission, clearance, confirmation, endorsement, waiver, certification, designation, rating, registration, qualification, application, notice of intent, order, authorization, or other similar rights obtained from, issued, granted, given, or otherwise made available by or under the authority of any Governmental Body.

"Governmental Body" means any: nation, foreign, federal, state, commonwealth, territory, county, local, municipality, district, administrative, or other governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, organization, unit, body, or entity and any court, arbitrator, judiciary, or other tribunal).

"Indebtedness" means any indebtedness (whether or not due, contingent, or deferred) owing to a Person, including (a) all indebtedness for borrowed money or for the purchase price of property and fees and expenses for services; (b) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (c) guaranties securing indebtedness for borrowed money; (d) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; and (e) any purchase price payment, earnout, or similar payment payable to another Person.

-2-

TFII 000002

controversy, or dispute commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"Second Contingent Payment" has the meaning set forth in Section 2.1.

"Seller" has the meaning set forth in the Introduction.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under U.S. Internal Revenue Code of 1986 Section 59A), customs duties, membership or other equity interests, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the tax Liability of any other Person.

"Transaction Documents" means this Agreement and any other documents necessary to effectuate the transactions contemplated by this Agreement.

"Transaction" means the transactions contemplated by the Transaction Documents.

## SECTION 2

### Basic Transaction

2.1 Purchase and Sale of Assets; Contingent Payments.

(a) Purchase and Sale of Assets. Seller hereby sells, assigns, transfers, conveys and delivers, free and clear of any Liens, all of the Seller's right, title and interest in and to the Assets, and Buyer shall deliver to Seller the Cash Consideration.

(b) Contingent Payments. In addition to the Cash Consideration, Buyer shall pay in cash by wire transfer of immediately available funds to the Seller as one or more Contingent Payments, as set forth below:

(i) On or prior to the date that is forty five (45) days from the date hereof, an amount equal to hundred percent (100%) of the gross margin (after deducting costs of the manufacturing, storing expenses, freights and commissions payable on sale) of sales of ECOroads products, excluding sales generated by or through the efforts of Buyer, its parent entity, Stucco and Construction Materials, Inc. or Mr. Edward Rotstein, for the period commencing on the date hereof and ending on the day that is thirty (30) days from the date hereof (the "First Contingent Payment");

(ii) On or prior to the date that is seventy five (75) days from the date hereof the date hereof, an amount equal to fifty percent (50%) of the gross margin (after deducting

-4-

costs of the manufacturing, storing expenses, freights and commissions payable on sale) of sales of ECOroads products, excluding sales generated by or through the efforts of Buyer, its parent entity or Mr. Edward Rotstein, for the period commencing on the thirty-one (31) day anniversary hereof and ending on the day that is sixty (60) days from the date hereof (the "Second Contingent Payment"); and,

(iii)     On or prior to the payment dates set forth above for each Contingent Payment, Buyer shall deliver, or shall cause to be delivered, to Seller a statement setting forth the amount of the applicable Contingent Payment (a "Contingent Payment Statement"), together with copies of all supporting work papers and accounting records that were utilized in preparing the Contingent Payment Statement.

(c)  Disagreements.

(i)     If Seller in good faith disagrees with Buyer's calculation of the Contingent Payments contained in a Contingent Payment Statement, Seller may notify Buyer of its conclusions (such notice, a "Payment Dispute Report") within thirty (30) days following Seller's receipt of the applicable Contingent Payment Statement. Any Payment Dispute Report delivered by Seller must be in writing, shall state in reasonable detail the basis for the conclusion and its calculation of the Contingent Payment due to the Stockholders.

(ii)     Buyer and Seller shall, during the ten (15) day period following delivery of a Payment Dispute Report, use their commercially reasonable efforts in good faith to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Contingent Payment, which agreement, if any, shall be memorialized in a written settlement agreement executed by Buyer and Seller. If during such period, Buyer and Seller are unable to reach such agreement (all unresolved matters, "Disputed Contingent Payment Matters"), they shall promptly thereafter submit the Contingent Payment Statement, the Payment Dispute Report and all supporting materials to a mutually agreeable independent accounting firm with whom Seller and Buyer have no material relationship (the "Independent Accountant").

(iii)     The Independent Accountant shall act promptly to resolve in writing all Disputed Contingent Payment Matters, and its decisions with respect to the Disputed Contingent Payment Matters shall be final and binding on each of the parties hereto. The Independent Accountant shall promptly notify Buyer and Seller of its resolution of the Disputed Contingent Payment Matters and shall prepare a revised Contingent Payment Statement reflecting the resolution of all Disputed Contingent Payment Matters (a "Final Contingent Payment Statement") and shall deliver it to Buyer and Seller. Each party shall bear its fees and expenses with respect to any proceeding under this Section 2.1(c), and the fees and expenses of the Independent Accountant in connection with the resolution of disputes pursuant to this Section 2.1(c) shall be paid by the non-prevailing party, whom shall be determined by the Independent Accountant.

(iv)     Within ten (10) days after receipt of the Final Contingent Payment Statement, if the amount of the Contingent Payment set forth in the Final Contingent Payment Statement is higher than such amount set forth in Buyer's original Contingent Payment Statement, Buyer shall pay such corresponding difference to the Seller, by wire of immediately available funds.

-5-

TFII 000004

2.2 <u>Closing</u>.  The closing of the Transaction (the "<u>Closing</u>") shall take place at the offices of Hogan Lovells US LLP, 525 University Avenue, 4th Floor, Palo Alto, California, on or before 2/15/2011, or at such other place and time as shall be mutually agreed upon in writing by the Parties (the "<u>Closing Date</u>").

2.3 <u>Deliveries at Closing</u>.

(a)  At the Closing, Seller shall deliver or cause to be delivered to Buyer the following (in each case, where applicable, in full force and effect and duly executed by an authorized officer of Seller):

(i)     this Agreement;

(ii)    the Patent Assignment of all patents and patent applications listed on Schedule A to Patent Assignment;

(iii)   the non-compete Agreement in the form agreed to between the Seller and the Buyer, signed by all board members and founders of Seller;

(iv)   assignment of the trademarks and contracts listed in <u>Exhibit A</u>;

(v)    the Assets, set forth on Exibit A;

(vi)   proof of approval of this Agreement by the corporate governmental body as provided by the Seller's Bylaws;

(vii)  Proof that notice of the sale of the Seller's assets are given to all creditors listed in the Exhibit   C   ; and

(vi)   all documentation related to and ownership for websites and marketing materials.

(b)  At the Closing, Buyer shall deliver or cause to be delivered to Seller the following (in each case, where applicable, in full force and effect and duly executed by an authorized officer of Buyer):

(i)     this Agreement;

(ii)    the Cash Consideration, in cash paid by wire transfer of immediately available funds to the Company; and

(iii)   a stock certificate or equivalent representing 10% of the outstanding equity of Buyer (the "<u>Equity Consideration</u>").

2.4 <u>Transfer Taxes</u>.  All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement shall be the responsibility of Buyer and shall be paid when due, by Buyer.

-6-

## SECTION 3

### Representations and Warranties of Seller

Seller hereby represents and warrants as follows:

3.1 <u>Corporate Power</u>.   Seller is a corporation duly organized, validly existing, and in good standing under the laws of Delaware. Seller has all requisite legal and corporate power and authority to execute and deliver the Transaction Documents and to carry out and perform its obligations under the terms thereof.

3.2 <u>Authorization of Transaction</u>.  Seller has all requisite power and authority to enter into the Transaction Documents and to consummate the Transactions.  The execution and delivery of the Transaction Documents, and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Seller, and no further action is required on the part of Seller to authorize the Transaction Documents and the Transactions. The Transaction Documents have been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by Buyer, constitute the valid and binding obligation of Seller enforceable in accordance with their terms, except as such enforceability may be limited by applicable law. Other than in connection with the Patent Assignment, Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Body or other Person in order to consummate the Transactions.

3.3 <u>Non-Contravention</u>.    Neither the execution and the delivery of the Transaction Documents, nor the consummation of the Transactions, will (a) violate any (i) material Legal Requirement or (ii) provision of the organizational documents of Seller; or (b) result in the imposition or creation of a Lien upon or with respect to the Assets.

3.4 <u>Title</u>.  Seller is the sole and exclusive owner of, and has good and valid title to all of the Assets, free and clear of all Liens, and is exclusively entitled to possess and dispose of the same. There are no outstanding agreements or options to buy that grant to any Person, other than Buyer, any license or other right with respect to the Assets, including without limitation the right to purchase or otherwise acquire any of the Assets. There are no Proceedings pending (nor has the Company received notice in writing of any threat thereof) related to the Assets.

## SECTION 4

### Representations and Warranties of Buyer Concerning the Transaction

Buyer hereby represents and warrants as follows:

4.1 <u>Authorization of Transaction</u>. Buyer has all requisite power and authority to enter into the Transaction Documents and to consummate the Transactions.  The Transaction Documents have been duly executed and delivered by Buyer and, assuming the due authorization, execution and delivery by Seller, constitute the valid and binding obligation of Buyer enforceable in accordance with their terms, except as such enforceability may be limited by applicable law. Buyer need not give any notice

TFII 000006

to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Body or other Person in order to consummate the Transactions.

4.2 <u>Non-Contravention</u>.  Neither the execution and the delivery of the Transaction Documents, nor the consummation of the Transactions, will violate any material Legal Requirement.

## SECTION 5

### <u>Post-Closing Covenants</u>

The Parties agree as follows with respect to the period following the Closing:

5.1 <u>General; Further Assurances</u>.  In the event at any time after the Closing any further actions are necessary or desirable to carry out and effectuate the purposes of any Transaction Document, each Party shall take such further actions (including the execution and delivery of such further instruments and documents and causing related entities to take further actions) as the other Party may reasonably request and at the expense of such requesting Party. Seller further agrees, promptly upon request of Buyer, its successors and assigns and at the expense of Buyer, its successors and assigns, to execute and deliver any assignment, application for copyright, patent or other intellectual property right protection, or any other papers which Buyer may reasonably request to fully secure to Buyer, its successors or assigns, all right, title and interest in and to each of the Assets, and to cooperate and assist in the prosecution of any opposition proceedings involving such rights and any adjudication of the same. Seller hereby designates and appoints Buyer and its duly authorized officers and agents, as Seller's agents and attorneys-in-fact to act for and on behalf of Seller and instead of Seller, to execute and file any documents and to do all other lawfully permitted acts necessary to perfect Buyer's rights in the Assets with the same legal force and effect as if executed by Seller, solely if, and only to the extent that Seller is unable for any reason to comply with its obligations under this Section 5.1, and only after reasonable attempts by Buyer to secure Sellers performance of such obligations.

5.2 <u>Confidentiality</u>.    Seller will treat and hold as confidential all of the Confidential Information, refrain from using or disclosing any of the Confidential Information except to perform its obligations under this Agreement, and deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information that are in its possession.  In the event that Seller is requested or required pursuant to written or oral question or request for information or documents in any Proceeding to disclose any Confidential Information, Seller will notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this <u>Section 5.2</u>.  If Seller is required by law to disclose the Confidential Information, Seller shall immediately provide to Buyer the content of the proposed disclosure, the reasons that such disclosure is required by law, and the time and place that the disclosure will be made, and shall afford Buyer the opportunity to present a timely objection to the Governmental Body that has compelled the disclosure.  No Party shall issue any report, statement, or press release with respect to this Agreement or the Transactions, without the prior written consent of the other Party, which shall not be unreasonably withheld.

5.3 <u>Maintenance and Other Fees</u>.  Buyer acknowledges and agrees that following the Closing Seller shall have no further responsibility or obligation to pay any maintenance fees, annuities, and

-8-

TFH 000007

the like due or payable with respect to the Assets and that Buyer shall have the sole responsibility and obligation for any such payments.

## SECTION 6

### Miscellaneous

6.1 <u>Governing Law and Venue</u>. This Agreement shall be governed in all respects by the laws of the State of Delaware as applied to agreements among Delaware residents entered into and to be performed entirely within Delaware, and the Parties agree that any litigation pertaining to this Agreement shall be exclusively adjudicated in a court located in San Francisco County, California.

6.2 <u>Assistance of Counsel</u>. The Parties acknowledge that they have read this Agreement, they have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel, they understand the terms and consequences of this Agreement, they are fully aware of the legal and binding effect of this Agreement.

6.3 <u>Successors and Assigns</u>. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the Parties hereto, provided, however, that the rights of each Party in connection with this Agreement shall not be assignable without the consent of the other Party. The foregoing notwithstanding, Seller shall be free to assign the right to receive the Contingent Payments to one or more third parties.

6.4 <u>Amendments and Modification</u>. This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by Seller and Buyer.

6.5 <u>Specific Performance; Injunctive Relief</u>. The Parties acknowledge that the other will be irreparably harmed and that there will be no adequate remedy at law for a violation of any of the covenants or agreements of the Parties set forth herein. Therefore, it is agreed that, in addition to any other remedies that may be available to the Parties upon any such violation, the Parties shall have the right to enforce such covenants and agreements by specific performance, injunctive relief or by any other means available to the Parties at law or in equity.

6.6 <u>Expenses</u>. The Parties shall each bear their own expenses incurred on their behalf with respect to this Agreement and the Transactions.

6.7 <u>Severability</u>. In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, such provision shall be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law.

6.8 <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not considered in construing or interpreting this Agreement.

-9-

TFII 000008

6.9 <u>Entire Agreement</u>.   The Transaction Documents set forth the entire understanding of the Parties hereto and supersede any prior and or written agreements and understandings with respect to the subject matter hereof.

6.10    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which may be executed by less than all of the Parties hereto, each of which shall be enforceable against the Parties actually executing such counterparts, and all of which together shall constitute one instrument.

6.11   <u>Acknowledgment</u>. The Seller acknowledges that the Buyer is not responsible for any debts incurred by the Seller prior to or after the date of signing of this Agreement.

6.12 <u>Loss.</u>  The Seller will be held liable for any loss suffered, incurred or paid by the Buyer, by reason of, in whole or in part, (i) any misrepresentation or inaccuracy in, or breach of, any representation or warranty made by the Seller in this Agreement or any Exhibits or Schedules hereto or the certificates delivered pursuant to this Agreement or (ii) any claim relating to a violation of obligations regarding non-competition, non-solicitation, confidentiality or the like in any agreement entered into prior to Closing by any person named in this agreement or in Non-competition Agreements.

IN WITNESS WHEREOF, this Intellectual Property Purchase Agreement is hereby executed as of the date first above written.

SELLER:                                   BUYER:

TERRAFUSION, INC.                         TERRAFUSION INTERNATIONAL, INC.
a Delaware corporation                    a Washington corporation

By: _____            By: _Edward Rothstein_____

Print Name: _Orri Orryn_____           Print Name: _ESR_____

Title: _CEO_____            Title: _President_____

-10-

WW037616/000001 - 59873 v5

TFII 000009

APR/18/2012/WED 06:45 AM    Westin Edina          FAX No. 952-567-5010            P. 010

## EXHIBIT A

### ASSETS

**IP ASSETS:**

The patents listed on Schedule A to Patent Assignment hereto and the following trademarks:

1.

| Country | Mark | Reg. No. | Status | Next Action/Deadline |
|---------|------|----------|--------|----------------------|
| U.S. | CA MAX | 3,298,794 | Registered on 09/25/2007 | Affidavit of Use Due: 09/25/2013 |
| U.S. | ECOROADS | 3,036,550 | Registered on 12/27/2005 | Affidavit of Use Due: 12/27/2011 |
| U.S. | TERRAFUSION | 3,426,183 | Registered on 05/13/2008 | Affidavit of Use Due: 05/13/2014 |
| U.S. | WE GET IT HARDER . . . | 3,187,964 | Registered on 12/19/2006 | Affidavit of Use Due: 12/19/2012 |

2. **CONTRACTS:**

a) Assignment of Technology Agreement entered into between Seller and SurTec, Inc., dated as of May 28, 2004.

b) Exclusive Production Agreement entered into between Seller and SurTec, Inc., dated as of May 28, 2004.

c) Option Agreement between the Seller and the Regents of the University of Idaho through the Office of Technology Transfer, dated as of June 17, 2010.

W0276I6/000001 - 59873 v5

TFII 000010

3. **Patent and Patent applications.**

TF05001CA Canada

Appln No./Filing Date: 2,670,962 / 25-Dec-2006

TF05001CN China

Appln No./Filing Date: 200680052860.3 / 15-Dec-2006

TF05001EA Eurasia*

Appln No./Filing Date: 200970413 / 25-Dec-2006

TF05001EP EPO**

Appln No./Filing Date: 06 845 648.2 / 15-Dec-2006

TF05001GEGeorgia

Appln No./Filing Date: AP2006 011229 / 15-Dec-2006

TF05001IN India

Appln No./Filing Date: 1475/MUMNP/08 / 15-Dec-2006

TF05001IL Israel

Appln No./Filing Date: 192196 / 15-Dec-2006

TF05001UA Ukraine

Appln No./Filing Date: 2009 06754 / 15-Dec-2006

TF05001USU U.S.

Appln No./Filing Date: 12/097,345 / 13-Jun-2008

TF05001C1 U.S. (Continuation of TF05001USU)

Appln No./Filing Date: 12/907,773 / 19-Oct-2010

TF05001UZ Uzbekistan

Appln No./Filing Date: IAP 2009 0139 / 15-Dec-2006

4. **Web sites (www.terrafusion.com and www.ecoroads.com ) documentation and related information.**

5. **Study and/or laboratory reports, foreign study and /or laboratory reports and marketing materials.**

## EXHIBIT B

### PATENT ASSIGNMENT

### IN THE UNITED STATES
### PATENT AND TRADEMARK OFFICE

### PATENT ASSIGNMENT

WHEREAS, Terrafusion, Inc., a Delaware corporation, with offices at 1145 2nd Street, Suite A331, Brentwood, California 94513 (the "Assignor"), is the sole owner of the entire right, title and interest in, to, and under the patents and pending applications listed on the attached Schedule A (the "Patents"); and

WHEREAS, [ENTER BUYER INFORMATION], with offices at 1Lake Bellevue Dr, Suite 203, Bellevue , WA 98005 (the "Assignee"), is desirous of obtaining the entire right, title and interest in, to and under said pending applications;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Assignor hereby assigns and transfers to Assignee, its successors and assigns, all of Assignor's right, title and interest in, to and under the Patents, as well as all divisions, renewals and continuations thereof, and all Letters Patent of the United States which may be granted thereon and all reissues and extensions thereof, and all applications for Letters Patent which may hereafter be filed for inventions embodied by the Patents in any country or countries foreign to the United States, and all Letters Patent which may be granted for said inventions embodied by the Patents in any country or countries foreign to the United States and all extensions, renewals and reissues thereof and all rights of priority in any such country or countries based upon the filing of the Patents in the United States which are created by any law, treaty or international convention (all of which shall be included in the term "Patents") with respect to patents and patent applications ,including foreign , listed on Schedule A to this Patent Assignment  and I hereby authorize and request the Commissioner of Patents of the United States, and any Official of any country or countries foreign to the United States, whose duty it is to issue patents on any such applications as aforesaid, to issue all Letters Patent for said inventions to Assignee, its successors and assigns, in accordance with the terms of this instrument.

AND Assignor does hereby covenant that it has full right to convey the entire interest herein assigned, and that Assignor has not executed, and will not execute, any agreement in conflict herewith.

APR/18/2012/WED 06:46 AM   Westin Edina        FAX No. 952-567-5010              P. 013

AND Assignor does further hereby covenant and agree that it will communicate to Assignee, its successors and assigns, any facts known to it respecting the Patents, and testify in any legal proceeding, sign all lawful papers, execute all divisional, continuing and reissue applications, make all rightful oaths and generally do everything possible to aid said Assignee, its successors and assigns, to obtain and enforce any attendant rights in all countries.

IN WITNESS WHEREOF, Terrafusion, Inc. has caused this instrument to be signed by a duly authorized corporate officer and its corporate seal to be affixed, as of this

_28_ th day of February , 2011.

TERRAFUSION, INC.

By:

Name: _Omar Doron_

Title: _CEO_

W027616/000001 - 59833 v3

TFII 000013

APR/18/2012/WED 06:46 AM   Westin Edina          FAX No. 952-567-5010          P. 014

### Schedule A to Patent Assignment

### List of Patents

**I. US Patent : Soil Stabilization System  US 7,841,806B2**

**2.**

| Country | Mark | Reg. No. | Status | Next Action/Deadline |
|---------|------|----------|--------|----------------------|
| U.S. | CA MAX | 3,298,794 | Registered on 09/25/2007 | Affidavit of Use Due:<br>**09/25/2013** |
| U.S. | ECOROADS | 3,036,550 | Registered on 12/27/2005 | Affidavit of Use Due:<br>**12/27/2011** |
| U.S. | TERRAFUSION | 3,426,183 | Registered on 05/13/2008 | Affidavit of Use Due:<br>**05/13/2014** |
| U.S. | WE GET IT HARDER . . . | 3,187,964 | Registered on 12/19/2006 | Affidavit of Use Due:<br>**12/19/2012** |

**3.PATENT APLICATIONS IN FOREING COUNTRIES**

| Country | Current Status | Associated Costs |
|---------|----------------|------------------|
| TF05001CA<br>Canada<br><u>Appln No./Filing Date</u>:<br>2,670,962<br>25-Dec-2006 | Application pending; Request for Examination Due: **December 15, 2011;** per instructions from Omri Dahan on 12/21/2009, we will wait to request examination pending the outcome of the corresponding U.S. application.<br>Annual Annuity Due: **12/15/2010**<br>Awaiting instructions to pay annuity | Fee to Request Examination:<br>$1,166.00 (at current rates)<br>Upon filing, maintenance fees are due annually, beginning with the 2nd year.<br>Annuity Fee: $400.00 |

W037616/000001 - 59873 v5

TFII 000014

| | | |
|---|---|---|
| TF05001CN<br><br>China<br><br><u>Appln No./Filing Date:</u><br><br>200680052860.3<br><br>15-Dec-2006 | Application published. First Office Action issued; Response to First Office Action filed 09/26/2010. | Upon grant, certificate and annuity fees will be due with annual annuities thereafter. |
| TF05001EA<br><br>Eurasia*<br><br><u>Appln No./Filing Date:</u><br><br>200970413<br><br>25-Dec-2006 | Application pending; examination requested on 05/25/2009; substantive examination is in process; awaiting Office Action.  Second Office Action issued. Response to Second Office<br><br>Action due  **01/27/2011.** | Upon grant, annual annuities are required. |
| TF05001EP<br><br>EPO**<br><br><u>Appln No./Filing Date:</u><br><br>06 845 648.2<br><br>15-Dec-2006 | Application pending; examination requested at the time the application was filed; awaiting Office Action; 4th Annuity due 12/15/2009; instructions sent to associate on 11/17/2009 to handle. Instructions for Response to Office Action sent to associate on **June 22, 2010.**<br><br>**Annuity Due:  12/15/2010**<br><br>**Awaiting instructions to pay annuity.** | Annual annuities are due to be filed until the patent grants.  When the application is ready to grant, TerraFusion will be required to select those EPO countries for which TerraFusion would like to proceed with patents.  Depending on the countries selected, additional fees will apply for translations and designation fees.<br><br>Annuity Fee:  $1,170.00 |
| TF05001GE<br><br>Georgia<u>Appln No./Filing Date:</u><br><br>AP2006 011229<br><br>15-Dec-2006 | Application pending; examination requested on 10/06/2009; substantive examination is in process.  Office Action issued; Response to Office Action filed 01/12/2010.  Search report issued.  **Awaiting instructions to abandon or maintain application.** | Upon grant, annual annuities are required. |
| TF05001IN<br>India<br><u>Appln No./Filing Date:</u><br>1475/MUMNP/08<br>15-Dec-2006 | Application published; examination requested on 07/14/2008; substantive examination is in process; awaiting Office Action. | Upon grant, certificate fee will be due with annual annuities thereafter. |

| | | |
|---|---|---|
| TF05001IL<br>Israel<br><u>Appln No./Filing Date:</u><br>192196<br>15-Dec-2006 | Application pending. Office Action issued; Response to Office Action due 12/29/2010.<br><br>**Awaiting instructions to abandon or maintain application.** | Annuities are due before the expiration of the 6th year, 10th year, 14th year and 18th year. |
| TF05001UA<br>Ukraine<br><u>Appln No./Filing Date:</u><br>2009 06754<br>15-Dec-2006 | Application pending; examination requested on 11/24/2009; substantive examination is in process. Office Action issued; Response to Office Action Due: **07/18/2011.** | Upon grant, annual annuities are required. Fees can either be paid at these deadlines or one lump sum covering the whole period of the validity of the patent. |
| TF05001USU<br>U.S.<br><u>Appln No./Filing Date:</u><br>12/097,345<br>13-Jun-2008 | Issued on 11/30/2010 as US 7,841,806 | Upon issuance, maintenance fees are required at 3.5 years, 7.5 years and 11.5 years. |
| TF05001C1<br>U.S.<br>(Continuation of TF05001USU)<br><u>Appln No./Filing Date:</u><br>12/907,773<br>19-Oct-2010 | Application pending; Notice to File Missing Parts issued; Response to Notice to File Missing Parts due: **01/02/2011.**<br><br>**Awaiting instructions to abandon or maintain application.** | |
| TF05001UZ<br>Uzbekistan<br><u>Appln No./Filing Date:</u><br>IAP 2009 0139<br>15-Dec-2006 | Application pending; examination requested on 12/15/2009; substantive examination is in process; awaiting Office Action. Awaiting Office Action. | Upon grant, annual annuities are required. |

*Covering the countries of Turkmenistan, Republic of Belarus, Republic of Tajikistan, Russia, The Azerbaijan Republic, the Republic of Kazakhstan, the Kirghiz Republic, the Republic of Armenia and the Republic of Moldova.

**Covering Austria, Belgium, Bulgaria, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Liechtenstein, Lithuania, Luxembourg, Monaco, Netherlands, Poland, Portugal, Romania, Sweden, Switzerland, Slovenia, Slovakia, Spain, Turkey and the United Kingdom

TFII 000016

## WAIVER AND ACKNOWLEDGEMENT

In order to facilitate the entry of Terrafusion, Inc., a Delaware corporation (the "Company") into an asset purchase agreement with TerraFusion International, Inc., a Washington corporation, in addition to the consent to assignment previously signed, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, with respect to the Exclusive Production Agreement entered into between the Company and SurTec, Inc., dated as of May 28, 2004, as amended to date, and Assignment of Technology Agreement (as outlined in Exhibit A on page 3 of this document), the undersigned, acting on behalf of SurTec, Inc. as dully appointed CEO and the principle acting on behalf of Terrafusion, Inc., agrees to the following:

1. SurTec, Inc. consents to the assignment by Terrafusion, Inc., a Delaware corporation (the "Company") to TerraFusion International, Inc., a Washington corporation of the above stated Agreements;

2. SurTec, Inc. further agrees to be bound by the above Agreements, as so transferred, and to amend certain language of the Agreements as offered by TerraFusion International, Inc. in writing as following:

2.1. With respect to the Exclusive Production Agreement entered into between TerraFusion, Inc. and SurTec, Inc. the following changes are agreed by SurTec, Inc.:

(i) Surtec, Inc. waives any claims against TerraFusion International, Inc. related to its right for a warrant to purchase shares of TerraFusion, Inc.'s Common Stock as provided by section A of Recitals of the Exclusive Production Agreement dated May 28, 2004;

(ii) Section 7 of the Exclusive Production Agreement shall be read as following: "The term of this Agreement shall be five (5) years from the date of the assignment of all rights and responsibility from TerraFusion, Inc. to TerraFusion International, Inc., unless sooner terminated as hereinafter provided. The Agreement shall automatically renew for successive three (3) years term unless sooner terminated as hereinafter provided."

(iii) Section 11 of the Exclusive Production Agreement is excluded from the Agreement effective date of closing of the asset purchase agreement entered between TerraFusion, Inc., a Delaware corporation and TerraFusion International, Inc., a Washington corporation. SurTec Inc. further waives any minimum purchase quota requirements and the penalties to the Company in the event that such minimum purchase quotas were not achieved in the past, and acknowledges that no such obligations attach to the Company or its assigns in the future, including, but not limited to pursuant to Section 11 of the Agreement, and that certain addendum to the Agreement, dated July 9, 2008.

(iv) SurTec, Inc. represents that section 2 of the Exclusive Production Agreement shall be amended so that pricing shall be as follows. In initial stock of 660 gallons of the base raw material to product Eco Road DS, will be ordered, which will include the down payment of 50% for initial stock ($28.03 X 660 gallons = $18,499.80). Note: There is a 45-day lead time for Surtec to receive this raw material prior to our modification thereof. This raw material will be modified to create the Terrafusion product and held in inventory, at no additional cost, ready for shipment as directed by Terrafusion. When this order is placed for shipment, the balance of the cost per gallon, as outlined below, will be paid to Surtec prior to shipment. All shipping orders are FOB Surtec Tracy

manufacturing facility.  If all of the product is not shipped within 120 days of placing the initial raw material order, the entire balance based on 55 gallon pricing, will be paid to Surtec.  Surtec will continue to inventory the remainder of the product at no charge for future shipments.  When the initial raw material stock is depleted, a new raw material order of 660 gallon minimum must be placed with payment of 50% to facilitate future orders.

- CAMAX 55 gallon - $54.46/gallon
- CAMAX 5 gallon - $55.16/gallon
- CAMAX 1 gallon - $55.46/gallon

- ECO ROAD DS 55 gallon - $56.06/gal
- ECO ROAD DS 5 gallon - $56.69/gal
- ECO ROAD DS 1 gallon - $57.06/gal

2.2.  With respect to the Assignment of Technology Agreement entered into between the Company and SurTec, Inc. the following changes are agreed by SurTec, Inc.:

(i) Surtec, Inc. waives any claims against TerraFusion International, Inc. related to its right for a warrant to purchase 360,000 shares of TerraFusion, Inc.'s Common Stock as provided by section B of Recitals of the Assignment of Technology Agreement and Section 2 of the Assignment of Technology Agreement;

(ii) SurTec, Inc. represents that all assigned Assets as defined in the Assignment of Technology Agreement has not been delivered to TerraFusion, Inc. as provided in Section 3 of the Assignment of Technology Agreement;

3. SurTec Inc. agrees to treat amendments as stated in this Waiver and Acknowledgement to be entered in writing as required by Section 20 of the Exclusive Production Agreement and Section 13 of the Assignment of Technology Agreement.

4. Terrafusion International, Inc. agrees to provide a success fee to SurTec, Inc. of 2.5% of net proceeds upon the sale of the Company for a minimum price of $5 million to a prospective investor or acquirer of the Company of all or substantially all of the Company's assets; or the sale of its securities with the United States Securities Exchange Commission. As an alternative, Terrafusion International, Inc. shall have the right, exercisable after the expiration of three years after the signing of this Waiver and Acknowledgment, to pay SurTec the amount of $125,000. If this option is exercised and/or the disclosure of the formula is required prior to completing the sale of the Company, SurTec will be obligated to reveal to Terrafusion International, Inc. the formula of the Product and blending instruction according to the Section 10 of the Exclusive Production Agreement and to deliver Embodiment and All Assigned Assets to TerraFusion International, Inc. according to the Section 3 of the Assignment Of Technology Agreement.

See Exhibit "A" Attached.

## EXHIBIT A

### Description of Technology

The Product is an aqueous solution of an enzymatic raw material and surface active agents or stabilizers designed to facilitate the stabilization, compaction and bonding of soils for roadbase construction. It is understood that the base enzymatic raw material was selected by Assignor from many options that are available; the enzymatic raw material was then modified to produce the Product. Assignor does not have the specific formulization of the enzyme raw material.

When required under the terms of the Exclusive Production Agreement, Assignor shall disclose the following information:

- Name of the enzymatic base raw material

- Identification of the provisioner(s) of the enzymatic base raw material

- Name and identification numbers of chemical(s) that Assignor adds to the enzymatic base raw material

- Identification by name, address and other pertinent contact information of the provisioners of the chemical(s) that Assignor adds to the enzymatic base raw material

- Formulation for the chemical(s) that are used to make the product to the extent such formulation(s) are known to Assignor

- Exact proportions of each ingredient and blending instructions.

SURTEC, INC.

FEBRUARY 3, 2011

By: _____

Print Name: W. A. Fields

Title: President

TERRAFUSION INTERNATIONAL, INC.

FEBRUARY 3, 2011

By: _____

Print Name: Edward Botkin

Title: President

W0057646/000001 - 61527 v1

TFII 000019

## ASSIGNMENT OF TECHNOLOGY AGREEMENT

This Assignment of Technology Agreement (this *"Agreement")* is made and entered into as of this 28th day of May, 2004, by and between SurTec, Inc., a California corporation (the *"Assignor")*, and TerraFusion, Inc., a Delaware corporation (the *"Assignee"*).

### RECITALS

A.     Assignor developed the Technology (as defined below) specifically for Assignee and at the direction of Assignee and/or its predecessors-in-interest.

B.     Assignor desires to assign and transfer to Assignee all of Assignor's right, title and interest in and to the Technology and all other related rights in exchange for Assignee's issuance to Assignor of a warrant to purchase 360,000 shares of Assignee's Common Stock (the *"Warrant")*.

C.     The parties are, contemporaneously with the entering of this Agreement, entering into that certain Exclusive Production Agreement ("Production Agreement").

NOW THEREFORE, in consideration of the mutual covenants, agreements and promises set forth herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

### AGREEMENT

1.     **Certain Definitions.**  As used herein, the following terms will have the meanings set forth below:

1.1     Technology.     The term *"Technology"* means that certain enzyme technology as more fully described in <u>Exhibit A</u> attached hereto and all technology, trade secrets and know-how exclusively related thereto.

1.2     Derivative.     The term *"Derivative"* means:  all improvements, modifications, alterations, adaptations, enhancements and new versions of the Technology (the *"Technology Derivatives"*).

1.3     Intellectual Property Rights.     The term *"Intellectual Property Rights"* means, collectively, all worldwide patents, patent applications, patent rights, copyrights, copyright registrations, moral rights, trade names, trademarks, service marks, domain names and registrations and/or applications for all of the foregoing, trade secrets, know-how, mask work rights, rights in trade dress and packaging, goodwill and all other intellectual property rights and proprietary rights relating in any way to the Technology, any Derivative, or any Embodiment, whether arising under the laws of the United States of America or the laws of any other state, country or jurisdiction, but only to the extent, if any, such rights are owned by Assignor, *it being*

*expressly understood and acknowledged by Assignee that (i) Assignor purchases the base enzyme and certain other chemicals used in the Technology from external providers, (ii) that such providers may have Intellectual Property Rights relating to such base enzyme and/or other chemicals and (iii) that Assignor can not and does not make any representation or conveyance with respect to the Intellectual Property Rights of such third parties.*

      1.4   <u>Embodiment</u>.  The term *"Embodiment"* means all documentation, drafts, papers, designs, schematics, diagrams, models, prototypes, source and object code (in any form or format and for all hardware platforms), computer-stored data, diskettes, manuscripts and other items describing all or any part of the Technology, any Derivative, any Intellectual Property Rights or any information related thereto or in which all of any part of the Technology, any Derivative, any Intellectual Property Right or such information is set forth, embodied, recorded or stored.

      1.5   <u>Assigned Assets</u>.  The term *"Assigned Assets"* refers to the Technology, all Derivatives, all Intellectual Property Rights and all Embodiments, collectively.

    **2.**   <u>**Assignment**</u>.  In consideration of the issuance to Assignor of the Warrant, receipt of which is hereby acknowledged, the Assignor hereby forever sells, assigns, transfers, releases and conveys to Assignee and its successors and assigns, the Assignor's entire right, title and interest in and to each and all of the Assigned Assets.

    **3.**   <u>**Delivery**</u>.  Assignor agrees to deliver all Embodiments of all Assigned Assets to Assignee as and when set forth under the terms and provisions of the Production Agreement.

    **4.**   <u>**Assignor Representations and Warranties**</u>.  Assignor represents and warrants to Assignee that (i) Assignor developed the Technology in connection with Assignee, (ii) that Assignor has an interest in and can grant exclusive right, title and interest in and to, each of the Assigned Assets (with the exception of the base enzyme and certain other chemicals used in the Technology which Assignor procures from external providers and can grant no interest in), and (iii) that Assignor has no actual knowledge that any of the Assigned Assets is subject to any dispute, claim, prior license or other agreement, assignment, lien or rights of any third party, or any other rights that might interfere with Assignee's use, or exercise of ownership of, any Assigned Assets (with the exception of the base enzyme and certain other chemicals used in the Technology which Assignor procures from external providers and can grant no interest in). Assignor further represents and warrants to Assignee that (x) the Assigned Assets are free of any claim of any prior employer or third party client of such Assignor, and (y) Assignor is not aware of any claims by any third party to any rights of any kind in or to any of the Assigned Assets. Assignor agrees to immediately notify Assignee upon becoming aware of any such claims.

    **5.**   <u>**Further Assurances**</u>.  The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.  Assignor further agrees, promptly upon request of Assignee or any of its successors or assigns, to execute and deliver, without further compensation of any kind, any power of attorney, assignment, application for copyright, patent or other intellectual property right protection, or any other papers which may be necessary or desirable to fully secure to Assignee and its successors and assigns, all right, title and interest in

TFII 000021

and to each of the Assigned Assets, and to cooperate and assist in the prosecution of any opposition proceedings involving said rights and any adjudication of the same. Further, Assignor agrees never to assert any claims, rights or moral rights in or to any of the Assigned Assets, except as provided in the Production Agreement.

6.   **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.

7.   **Governing Law**.  This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to that body of laws pertaining to conflict of laws.

8.   **Entire Agreement**.  This Agreement and the documents referred to herein, constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

9.   **Successors and Assigns; Assignment**.  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  Either party may assign any of its rights and obligations under this Agreement.

10.   **Notices**.  Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following: (i) at the time of personal delivery, if delivery is in person; (ii) at the time of transmission by facsimile, addressed to the other party at its facsimile number specified herein (or hereafter modified by subsequent notice to the parties hereto), with confirmation of receipt made by both telephone and printed confirmation sheet verifying successful transmission of the facsimile; (iii) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States, with proof of delivery from the courier requested; or (iv) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries.

All notices for delivery outside the United States will be sent by facsimile or by express courier.  All notices not delivered personally or by facsimile will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address or facsimile number set forth below the signature lines of this Agreement, or at such other address or facsimile number as such other party may designate by one of the indicated means of notice herein to the other parties hereto.  Notices by facsimile shall be machine verified as received.

11.   **Titles and Headings**.  The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.  Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

12.     **Severability**.  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.  Notwithstanding the foregoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

13.     **Amendment and Waivers**.  This Agreement may be amended only by a written agreement executed by each of the parties hereto.  No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought.  Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns.  No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.  No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

14.     **Facsimile Signatures**.  This Agreement may be executed and delivered by facsimile and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

TFII 000023

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the date and year first above written.

**ASSIGNOR**                          **ASSIGNEE**

SURTEC, INC.                          TERRAFUSION, INC.

By: _____        By: _____

Name: _____         Name: _____

Title: _____       Title: _____

Address: _____        Address: _____

_____            _____

_____            _____

Fax Number: _____        Fax Number: _____

TFII 000024

## CONSENT TO ASSIGNMENT

The undersigned hereby consents to the assignment by Terrafusion, Inc., a Delaware corporation (the "Company") to TerraFusion International, Inc., a Washington corporation of the following agreements: (i) Assignment of Technology Agreement entered into between the Company and SurTec, Inc., dated as of May 28, 2004, and (ii) Exclusive Production Agreement entered into between the Company and SurTec, Inc., dated as of May 28, 2004, and further agrees to be bound by the above agreements, as so transferred.

Surtec, Inc. waives any claims against TerraFusion International, Inc. related to its right for a warrant to purchase 360,000 shares of TerraFusion, Inc.'s Common Stock as provided by section B of Recitals of the Assignment of Technology Agreement dated May 28, 2004.

SURTEC, INC.

By: _W. Fields_

Print Name: _W. A. Fields_

Title: _President_

TFII 000025

**CERTIFICATE OF SERVICE**
*Edward Rotstein, et al. v. Terrafusion, Inc., et al.*
Case No. 3:15-CV-02993-RS

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and am not a party to the within action; my business address is 11766 Wilshire Blvd., Sixth Floor, Los Angeles, CA 90025-6538. On February 28, 2017, I served the following document(s) described as **DECLARATION OF EDWARD ROTSTEIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST TERRAFUSION, INC. and MCCP, INC. aka MCCP, LTD. and aka MCC PARTNERS NY, LTD., INCLUDING DISMISSAL OF COUNTERCLAIMS** on the interested parties in this action as follows:

by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

Zvi "Hershy" Silver, Esq.
hsilver@silverlawfirm.com
Attorneys for Defendants and
Counter-Claimants
TERRAFUSION, INC. and MCC
PARTNERS NY, LLC

Ilya A. Kosten, Esq.
ikosten@selmanlaw.com
Matthew C. Elstein, Esq.
melstein@selmanlaw.com
Todd A. Duplanty, Esq.
tduplanty@selmanlaw.com
Suzanne E. Rischman, Esq.
srischman@selmanlaw.com
Attorneys for Plaintiffs and Counter-Defendants, EDWARD ROTSTEIN and TERRAFUSION INTERNATIONAL, INC.

☒   **BY ELECTRONIC SERVICE:** by transmitting a copy of the foregoing document(s) via internet/electronic mail to CM/ECF for service on all parties in this case via their e-mail addresses, pursuant to court order, which includes the following plaintiff's counsel:

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 28, 2017, at Los Angeles, California.

*/s/ Sharlen D. Campbell*
SHARLEN D. CAMPBELL

Selman Breitman LLP
ATTORNEYS AT LAW